IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| GOLDEN BRIDGE TECHNOLOGY, INC. § | |
| § | |
| Plaintiff § | |
| § | |
| vs. § | CASE NO. 2:05-CV-170 |
| § | |
| NOKIA, INC., et al. § | |
| § | |
| Defendants § | |

MEMORANDUM OPINION AND ORDER

Before the Court is Nokia, Inc.; Motorola, Inc.; T-Mobile USA, Inc.; Ericsson, Inc.; Panasonic Mobile Communications Co. LTD; NTT Docomo, Inc.; Qualcomm Incorporated; and Lucent Technologies, Inc.'s (collectively "Defendants") Joint Motion to Dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim and under 12(b)(1) for lack of subject matter jurisdiction (Docket No. 49). For the reasons discussed below, the Court **DENIES** Defendants' Motion.

BACKGROUND

Defendants and Golden Bridge Technology Inc. ("GBT") are members of a non-profit standard setting organization called Third Generation Partnership Project ("3GPP"). 3GPP is composed of representatives from wireless telecommunications companies from all over the world. 3GPP was created to institute uniform technology standards for telecommunications systems and equipment to ensure worldwide compatibility of Wideband Code Division Multiple Access ("WCDMA") devices and systems.

GBT develops technology utilized in the wireless communications industry, specifically for

WCDMA systems. GBT owns the patent to a technology called Common Packet Channel ("CPCH"), which allows medium-sized packets of electronic information to be sent between a cellular phone and a base station. In 1999, CPCH was adopted by 3GPP as an optional part of the 3GPP standard. This meant that manufacturers of cellular equipment were not required to use CPCH, but if they chose to include the technology they had to comply with the CPCH standard set out by 3GPP.[1]

GBT alleges that after the issuance of its patents covering CPCH technology it began discussions with several Defendants to secure licenses of the technology. In March 2005, the 3GPP Technical Standards Group met at a meeting in Tokyo, Japan. Defendants were all represented at this meeting. However, GBT was not in attendance. At the meeting, most of the Defendants were participants in the "Feature Clean Up Committee" that decided which technologies would be proposed for removal from the standard. Allegedly, CPCH was added to the list of features for removal as a result of an "offline session" involving Defendants. The contents of this "offline session" were not recorded in the minutes of the official session. GBT claims that Defendants conspired among themselves not to deal with GBT and to have CPCH removed from the 3GPP standard. GBT contends that Defendants sought to remove CPCH from the 3GPP standard to prevent having to pay royalties to GBT for its technology and to ensure that network operators would be unable to demand the equipment from Defendants. GBT claims it was not given any prior notice that CPCH would be considered for deletion at the March meeting.

GBT filed this complaint on May 6, 2005 alleging a violation of the Sherman Antitrust Act,

---

[1] Telecommunications manufacturers that implemented CPCH were not required by law to follow 3GPP standards. However, if a manufacturer implemented CPCH it would need to follow 3GPP standards to ensure that its equipment was compatible with other telecommunications equipment and networks.

15 U.S.C. § 1 and state law claims for tortious interference with prospective economic advantage and unfair competition. 3GPP approved the recommendation for deletion of CPCH from the standard at a plenary session in Quebec, Canada on June 1-3, 2005. GBT claims the removal of CPCH from the 3GPP standards eliminated GBT's ability to market CPCH and excluded GBT and CPCH from the market by foreclosing the ability of telecommunications equipment manufacturers and network operators to implement CPCH. GBT claims that Defendants' actions exemplify a classic group boycott or concerted refusal to deal constituting a *per se* violation of § 1 of the Sherman Antitrust Act ("Sherman Act"). Defendants contend that GBT has not asserted a claim under the Sherman Act because GBT has not alleged that Defendants engaged in a conspiracy, the *per se* rule does not apply to standard setting activities such as those at issue in this case, GBT has not defined a relevant market, and GBT lacks antitrust standing because it has not pled an antitrust injury.

## STANDARD OF REVIEW

Dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) is appropriate where a party fails to state a claim upon which relief can be granted. *See* FED. R. CIV. P. 12(b)(6). In ruling on a Rule 12(b)(6) motion to dismiss, a court construes the complaint in favor of the plaintiff and all facts pleaded are taken to be true, no matter how improbable those facts. *See Neitzke v. Williams*, 490 U.S. 319, 327 (1989); *Lowrey v. Texas A&M Univ. Sys.,* 117 F.3d 242, 247 (5th Cir. 1997). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). However, "in order to avoid dismissal for failure to state a claim . . . a plaintiff must plead specific facts, not mere conclusory allegations." *Collins v. Morgan*

*Stanley Dean Witter,* 224 F.3d 496, 498 (5th Cir. 2000). A court "will thus not accept as true conclusory allegations or unwarranted deductions of fact." *Id.*

## THE SHERMAN ANTITRUST ACT

Section 1 of the Sherman Act states that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." To establish a § 1 violation, a plaintiff must prove that: (1) the defendants engaged in a conspiracy, (2) the conspiracy had the effect of restraining trade, and (3) trade was restrained in the relevant market. *Apani Sw., Inc. v. Coca-Cola Enter., Inc.*, 300 F.3d 620, 627 (5th Cir. 2002); *Spectators' Comm. Network Inc. v. Colonial Country Club*, 253 F.3d 215, 220 (5th Cir. 2001); *Johnson v. Hosp. Corp. of Am.*, 95 F.3d 383, 392 (5th Cir. 1996).

**1. Conspiracy**

Defendants argue GBT has not alleged that Defendants engaged in a conspiracy. Defendants contend they did not conspire against GBT but only made recommendations as participants of the Feature Clean Up Committee at the March 2005 meeting in Tokyo. GBT alleged Defendants engaged in a conspiracy at the March 2005 meeting:

> 42. Defendants acted in concert with each other by voting and/or agreeing to remove CPCH from the next release of the 3GPP technical standards, without notice, without technical justification, and without a replacement, for the purpose of injuring and interfering with GBT's business, in part because of GBT's efforts to obtain favorable licenses for its technology.
>
> . . . .
>
> 46. At the March 9-11 3GPP meeting, Defendants combined and conspired to refuse to deal with GBT with respect to CPCH, and encouraged others to refuse to deal with GBT by eliminating CPCH as an optional standard for 3GPP technology, contrary to Section 1 of the Sherman Anti-Trust Act, 15

U.S.C. § 1.

GBT sufficiently alleges that Defendants engaged in a conspiracy to overcome a 12(b)(6) motion to dismiss. This is especially true since GBT has not been able to conduct extensive discovery at this point in the proceedings to determine exactly what occurred among the Defendants prior to and during the March 3GPP meeting in Tokyo.

**2. Unreasonable Restraint of Trade**

*a. Applicable law*

An action must be deemed an unreasonable restraint of trade to violate § 1 of the Sherman Act. *Nw. Wholesale Stationers, Inc. v. Pac. Stationary & Printing Co.*, 472 U.S. 284, 289 (1985). An unreasonable restraint of trade can be proven using either "the *per se* rule" or "the rule of reason." *See Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 289 (5th Cir. 1988). Under the rule of reason analysis a plaintiff must "show that the defendants' actions amounted to a conspiracy against the market—a concerted attempt to reduce output and drive up prices or otherwise reduce consumer welfare." *Id*. at 293-92. A plaintiff must establish two elements related to an anticompetitive conspiracy under the rule of reason: "(1) that the defendant engaged in some form of joint action, and (2) that this joint action amounted to an unreasonable restraint of trade." *Id*. at 293. An unreasonable restraint of trade can be established by proving either an unlawful purpose or an anticompetitive effect. *Id*. at 294. In *Northwest Wholesale Stationers*, the Supreme Court stated that claims under § 1 of the Sherman Act are subject to the rule of reason analysis

> unless the challenged action falls into the category of "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use."

5

> . . . .
>
> . . . The decision to apply the *per se* rule turns on "whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output . . . or instead one designed to 'increase economic efficiency and render markets more, rather than less, competitive.'"

472 U.S. at 289-90 (internal citations omitted)(quoting *N. Pac. R.R. Co. v. United States*, 356 U.S. 1, 5 (1958); *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19-20 (1979)).

GBT has only alleged a *per se* violation of § 1 of the Sherman Act. Defendants also argue that GBT has not pleaded facts sufficient to state a *per se* violation of § 1. Defendants argue the *per se* rule is inapplicable in this situation and that the rule of reason should be applied.

*b.  Pleading a* per se *violation*

As pled, Defendants' actions exemplify a classic group boycott constituting a *per se* violation of § 1 of the Sherman Act. In *Northwest Wholesale Stationers*, the Supreme Court stated that it "has long held that certain concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as *per se* violations of § 1 of the Sherman Act." *Id*. at 293. The Supreme Court further stated that "there is more confusion about the scope and operation of the *per se* rule against group boycotts than in reference to any other aspect of the *per se* doctrine." *Id*. at 294. The Court continued, "cases to which this Court has applied the *per se* approach have generally involved joint efforts by a firm or firms to disadvantage competitors by 'either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.'" *Id*. "In these cases the boycott often cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete, . . . and frequently the boycotting firms possessed a dominant position in the relevant market." *Id*. (internal

citations omitted). GBT alleges that Defendants combined and conspired to refuse to deal with GBT with respect to CPCH and encouraged others to refuse to deal with GBT by eliminating CPCH from the 3GPP standard in violation of § 1 of the Sherman Act. GBT alleges this violation has cut off its access to the market. GBT has alleged a classic *per se* group boycott.

*c. Applicability of the* per se *rule to standard setting organizations*

Defendants argue that all standard setting cases are judged under the rule of reason and not the *per se* rule. Defendants cite *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501 (1988) arguing that lower courts only apply the rule-of-reason analysis to product standard setting by private associations. Defendants interpret the Court's language in *Allied Tube* to wholly exclude the application of the *per se* rule in any case involving a private standard setting organization. When read in its entirety, the language relied on by Defendants reveals a less definite rule than Defendants suggest. In *Allied Tube*, the Court, while discussing the application of antitrust immunity under the doctrine of *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), stated in dicta:

> There is no doubt that the members of [private standard setting] associations have economic incentives to restrain competition and that the product standards set by such associations have a serious potential for anticompetitive harm. Agreement on a product standard is, after all, implicitly an agreement not to manufacture, distribute or purchase certain types of products. Accordingly, private standard-setting associations have traditionally been objects of antitrust scrutiny. When, however, private associations promulgate safety standards based on the merits of objective expert judgment and through procedures that prevent the standard-setting process from being biased by members with economic interests in stifling product competition, those private standards can have significant procompetitive advantages. It is this potential for procompetitive benefits that has led most lower courts to apply the rule-of-reason analysis to product standard-setting by private associations.

*Allied Tube*, 486 U.S. at 500-01 (internal citations and footnotes omitted). Here, the Court is

7

discussing the application of the *per se* rule to private associations promulgating safety standards for products, as well as certain procedures that lend credibility to private standard setting associations. It is not clear whether the Court is referring to all private standard setting associations or just those that set safety standards for products. Furthermore, the Court states that "most," not all, lower courts have applied the rule of reason analysis based on the procedural safeguards. Thus, the Court's language does not create a hard and fast rule excluding the application of the *per se* rule to all private standard setting organizations.

Additionally, the present case is distinguishable from *Allied Tube* in that it is not a case against a private standard setting association. GBT does not allege that 3GPP's actions were anticompetitive or that its actions were illegal. GBT does not allege that 3GPP itself violated § 1 of the Sherman Act. Instead, GBT alleges that Defendants excluded CPCH from the market by conspiring to use their influence in 3GPP to remove CPCH from the 3GPP standards. The fact that the alleged § 1 violation arises within the context of a standard setting organization does not by itself prevent the application of the *per se* rule.

Defendants also rely on the Fifth Circuit's holding in *Consolidated* to argue that the Court should not apply the *per se* rule in the present case. *Consolidated* is also distinguishable from the present case in several respects. In *Consolidated*, the plaintiff Consolidated Metal Products, Inc. ("Consolidated") alleged that the American Petroleum Institute ("API"), a petroleum industry trade association, violated § 1 of the Sherman Act by delaying trade standard certification of sucker rods manufactured by Consolidated.[2] 846 F.2d at 286. API is the only standard setting body for oil field

---

[2] Sucker rods are equipment used in the oil industry to pump oil from wells that have low levels of natural pressure. 846 F.2d at 286.

equipment in the United States. *Id*. Equipment manufacturers apply to API for product approval and to receive a license to display the API monogram on their equipment. *Id*. The monogram indicates to purchasers that the product complies with API specifications. *Id*. In holding that the *per se* rule did not apply, the Fifth Circuit stated, "Consolidated complains of lost sales but fails to allege that sucker rod users are in some way constrained from buying its products. Indeed, Consolidated admits that, before the demand for domestically-produced oil fell, it was able to sell a substantial amount of its rods." *Id*. at 291-92. In holding that the *per se* rule did not apply the court further stated:

> A trade association that evaluates products and issues opinions, without constraining others to follow its recommendations, does not *per se* violate section 1 when, for whatever reason, it fails to evaluate a product favorably to the manufacturer. Here, denial of API certification in no real sense "excludes" Consolidated from the market: without certification, Consolidated admits that it is still free to sell its products and consumers are free to buy them.

*Id*. at 292. The court, giving significant weight to the absence of an exclusionary effect on Consolidated's ability to sell its rods in the market, stated, "Consolidated does not allege that consumers are somehow unable to use its rods as they would API-monogrammed rods. Thus, Consolidated offers no evidence of a *per se* violation of section 1." *Id*.

API and 3GPP are different types of standard setting organizations. In *Consolidated*, API approved products to indicate to consumers that a certain product met API's standard of quality. In the present case, 3GPP sets standards throughout the entire wireless communications industry to insure compatibility of equipment. If telecommunications equipment is not in compliance with 3GPP standards it will not be compatible with the telecommunications networks and other equipment. Accordingly, it will essentially be useless. Although GBT can still offer to sell CPCH

9

technology in theory, in reality no one will purchase it because it would make their equipment incompatible with other cellular communications equipment. 3GPP's standards are not just a "stamp of approval" but potentially have an exclusionary effect on GBT's access to the market. Furthermore, unlike *Consolidated*, consumers are arguably unable to use CPCH because it has been excluded from the 3GPP standard. In *Consolidated*, API's approval improved oil field equipments' marketability, but unapproved products were not excluded from the market and could be effectively used by consumers. GBT is allegedly excluded from selling CPCH to consumers because the 3GPP standard determines what cellular communications technology will, or will not, be used in the industry. A technology not included in the 3GPP standard is unsaleable because manufacturers of cellular communications equipment and network operators will not implement technology that is not compatible with the standard. Unlike the situation in *Consolidated*, CPCH is arguably excluded from the market by not being a part of the 3GPP standard.

Courts have identified certain situations where the application of the *per se* rule to standard setting organizations is not appropriate. However, the present case is distinguishable from these situations. The *per se* rule can apply to a standard setting organization such as 3GPP. GBT has appropriately alleged a *per se* violation in this context.

**3. Relevant Market**

There is limited guidance from the Fifth Circuit as to whether a plaintiff alleging a *per se* group boycott violation under § 1 of the Sherman Act must define a relevant market. Although the court did not discuss the relevant market element in detail, in *Spectators' Communication Network*, the Fifth Circuit held that a plaintiff alleging a *per se* group boycott violation under the Sherman Act

must prove an unreasonable restraint of trade occurred in a "particular market." *See* 253 F.3d at 220.

Defendants claim that GBT has not defined a relevant market. Although GBT contends it does not need to define a relevant market, it claims it has done so. A relevant market has both geographic and product dimensions. *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 487 (5th Cir. 1984). GBT alleges that it pled a geographical market, the entire world: "The 3GPP standards are intended to allow cellular phones which are compatible with these standards to be usable throughout the world, including within the United States." (Complaint, ¶ 22). Furthermore, GBT claims it pled a relevant product market, cellular communication technology: "All of the foregoing companies compete with one another in the market for cellular communications products, including WCDMA equipment, and are competitors with each other and with GBT with respect to technology to be used in cellular communications products." (Complaint, ¶ 30). GBT contends that the cellular communications technology product market includes technology and equipment used to allow one person to place a call on his or her cellular phone and talk with someone else regardless of the brand of equipment the caller, network operator, and receiver are using. Defendants claim that this is not a definite market because it includes technologies that are not interchangeable with, or substitutes for, CPCH.[3] Defendants argue that because a relevant market must begin with the

---

[3] Defendants cite *Apani Southwest, Inc. v. Coca-Cola Enterprises, Inc.*, 300 F.3d 620, 628 (5th Cir. 2002), for the proposition that a relevant market must be defined "with reference to the rule of reasonable interchangeability and cross-elasticity of demand." The Court recognizes the Supreme Court and Fifth Circuit's application of this standard when defining a relevant market in some cases, particularly those involving alleged violations of § 2 of the Sherman Act. However, the Court is unaware of any Supreme Court or Fifth Circuit cases applying this standard to a *per se* group boycott violation analysis under § 1 of the Sherman Act. The application of the standard is also complicated by the fact that CPCH is a patented technology, which by its nature does not have direct product competition within its market.

11

product at issue, and CPCH is not "interchangeable" with any other product, the relevant market begins and ends with CPCH. Accordingly, Defendants contend that GBT cannot define a relevant market.

Although a definite understanding of the market is not clear at this point in the proceedings, Defendants' definition of the relevant market is too narrow. GBT has alleged a sufficient definition of the relevant market to overcome a 12(b)(6) motion to dismiss for failure to state a claim.

### 4. Antitrust Standing

Defendants claim that GBT does not have antitrust standing because it has not alleged an antitrust injury. *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 422 (5th Cir. 2001) (considering "the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws (antitrust injury)" to determine whether a plaintiff has antitrust standing). GBT alleges that Defendants' conspiracy caused GBT's antitrust injury, the loss of licensing revenues, in that CPCH would have been licensed had Defendants not excluded CPCH from the 3GPP standard. Defendants contend that GBT had not licensed CPCH to any company before its elimination from the 3GPP standard and, therefore, could not have suffered an antitrust injury at the hands of Defendants because CPCH had no market.

Defendants argue *Sony Electronics, Inc. v. Soundview Technologies, Inc.*, 281 F. Supp 2d 399, 402-03 (D. Conn. 2003) is analogous in that the alleged antitrust violation was not the proximate cause of GBT's loss and, therefore, no antitrust injury exists. *Sony Electronics* is neither authoritative nor on point with the present case. In *Sony Electronics*, the plaintiff, Soundview

Technologies, Inc. ("Soundview"), patented a process for blocking the content of television programming. *See id*. at 401. Sony Electronics, Inc. ("Sony") and other television manufacturers initiated a declaratory judgment action that it did not infringe Soundview's patents. *Id*. Subsequently, Soundview brought a counterclaim for antitrust violations against Sony and other television manufacturers alleging that they conspired to fix licensing fees and refused to deal with Soundview. *See id*. The court held that Soundview had not established an antitrust injury because it had not proven that any television manufacturer needed a license from Soundview to manufacture televisions in compliance with FCC and industry standards for program content blocking. *See id*. at 402. Because Sony and the other manufacturers did not need a license to produce televisions in compliance with FCC and industry standards for program content blocking , there was no proximate cause between Soundview's alleged conspiracy and its claimed loss of licensing revenues. *See id.* at 403.

The present case is distinguishable from *Sony Electronics* in that any entity wanting to use CPCH technology in its cellular communications equipment would have to conform to the 3GPP standard of which CPCH was a part. Therefore, to comply with the 3GPP standard any entity wanting to integrate CPCH would necessarily need to obtain a license from GBT. It is difficult to determine exactly what would have occurred had CPCH remained a part of the 3GPP standard. However, GBT has adequately alleged that their antitrust injury was proximately caused by Defendants' alleged antitrust violations. Therefore, GBT has plead sufficient facts to establish antitrust standing.

## LUCENT TECHNOLOGIES' SEPARATE REPLY

Lucent Technologies ("Lucent") filed a separate reply to GBT's Response in Opposition to Defendants' Motion to Dismiss. Lucent claims that it should be dismissed from the case because it did not participate in the "Feature Clean Up Committee" that recommended removing CPCH from the 3GPP standard at the March 2005 meeting in Tokyo. Lucent argues that GBT claims participation on this committee was the sole wrongful activity giving rise to its claims.

It is not disputed that Lucent was not a participant in the "Feature Clean Up Committee" that made the official recommendation to remove CPCH from the 3GPP standard. However, GBT alleges in its Complaint that Defendants, including Lucent, "combined and conspired to refuse to deal with GBT with respect to CPCH, and encouraged others to refuse to deal with GBT by eliminating CPCH as an optional standard for 3GPP technology." GBT states in its Complaint that the decision to add CPCH to the list of features to be deleted was "the outcome of an offline session" and not something that took place during the official session on the record. GBT alleges that Lucent combined and conspired with the other Defendants in violation of § 1 of the Sherman Act. The fact that Lucent did not participant in the "Feature Clean Up Committee" does not mean that it was not a part of the alleged conspiracy. Lucent was present at the Tokyo meeting in March of 2005 where the alleged conspiracy occurred. GBT alleges that Lucent took part in that alleged conspiracy. Accordingly, at this point in the proceedings GBT has pled sufficient facts to overcome a motion to dismiss for failure to state a claim with regard to Lucent.

## STATE LAW CLAIMS

Defendants ask that the Court dismiss GBT's state law claims for lack of jurisdiction or, alternatively, for failure to state a claim. Both of Defendants' arguments are dependent upon the Court's dismissal of the § 1 claims under the Sherman Act. For the reasons discussed above, the Court is not dismissing the claim under § 1. Accordingly, the Court will not dismiss the state claims for lack of jurisdiction or failure to state a claim.

## CONCLUSION

For the reasons discussed above, the Court **DENIES** Defendants' motion to dismiss for failure to state a claim.

**So ORDERED and SIGNED this 17th day of February, 2006.**

_____
**LEONARD DAVIS
UNITED STATES DISTRICT JUDGE**